1    GARY C. MOSS, ESQ.
     State Bar No. 4340
2    JOANNA S. KISHNER, ESQ.
     State Bar No. 5037
3    DLA PIPER RUDNICK GRAY CARY US LLP
     3960 Howard Hughes Parkway
4    Suite 400
     Las Vegas, Nevada 89109
5    (702) 737-3433

6
     MARC L. ZAKEN, ESQ. (admitted *pro hac*)
7    EDWARDS & ANGELL, LLP
     301 Tresser Blvd.
8    Stamford, CT 06901

9    Attorneys for Defendant

10

11                  UNITED STATES DISTRICT COURT

12                       DISTRICT OF NEVADA

13

14   EDITH LEDDY,                        )
                                         )
15              Plaintiff,               )
                                         )
16         v.                            )  Case No.: CV-S-04-1070-JCM-RJJ
                                         )
17                                       )
     MEDCO HEALTH SOLUTIONS              )
18   OF LAS VEGAS, INC.,                 )
                                         )
19              Defendant.               )
                                         )
20   ────────────────────────────

21      **DEFENDANT'S OPPOSITION TO PLAINTIFF'S MOTION TO SET
        ASIDE VOLUNTARY DISMISSAL AND MEMORANDUM OF POINTS**
22              **AND AUTHORITIES IN SUPPORT THEREOF**

23      Pursuant to Federal Rule of Civil Procedure 60, Defendant Medco Health Solutions of Las

24   Vegas, Inc. (hereinafter referred to as "Defendant" or "Medco"), by and through its counsel of

25   record, hereby objects to Plaintiff Edith Leddy's (hereinafter referred to as "Plaintiff") Motion to Set

26

27   Doc. #4742202                          1

28

**28**

Set Aside Voluntary Dismissal filed with this Court on October 14, 2005 for the reasons set forth in the within Memorandum of Points and Authorities.

DLA PIPER RUDNICK GRAY CARY US LLP


_Joanna S. Kishner_

Gary C. Moss, Esq.
Joanna S. Kishner, Esq.
3960 Howard Hughes Parkway
Suite 400
Las Vegas, Nevada 89109

Marc L. Zaken, Esq.
EDWARDS & ANGELL LLP
301 Tresser Blvd.
Stamford, CT 06901
Attorneys for Defendant

## MEMORANDUM OF POINTS AND AUTHORITIES

Defendant, by and through its counsel of record, submits the following Memorandum of Points and Authorities in Opposition of Plaintiff's Motion to Set Aside Voluntary Dismissal.

## PRELIMINARY STATEMENT

Following an agreement to settle reached at an early neutral evaluation session conducted by the Honorable Peggy A. Leen, Plaintiff freely and voluntarily executed a General Release and Settlement Agreement with Defendant, which was followed by a Joint Stipulation of Voluntary Dismissal signed by counsel for Plaintiff and Defendant and endorsed by this honorable court.  The General Release and Settlement Agreement, which Plaintiff herself executed, stated that the Agreement was signed by Plaintiff of "her own free will" and outlined how the settlement proceeds would be distributed between Plaintiff and her attorney.  Any dispute Plaintiff may now have with her counsel over the fees charged by her counsel is a matter that needs to be resolved between Plaintiff and her counsel.  Moreover, if Plaintiff felt

Doc. #4742202                                        2

that Arthur Berry did not freely testify at his deposition, a deposition which was taken in advance of the early neutral evaluation session and at which Plaintiff was present, Plaintiff should not have signed the General Release and Settlement Agreement and filed the Stipulation of Voluntary Dismissal.  Because there is no dispute that Plaintiff made a deliberate decision to forego her claims in return for a monetary payment during the early neutral evaluation session, during which she was represented by counsel of her own choosing, Rule 60 cannot provide Plaintiff any grounds for relief.  Plaintiff's Motion to Set Aside Voluntary Dismissal should be denied in its entirety.

## FACTS

On August 2, 2005, the parties and their respective counsel convened before the Honorable Peggy A. Leen to participate in an early neutral evaluation session.  During this session, Plaintiff agreed to withdraw all claims against Medco in return for a monetary payment.  Magistrate Judge Leen then ordered a telephonic status hearing for September 6, 2005 unless, prior to September 1, 2005, the parties executed a settlement agreement and filed dismissal papers with the court.  See Minute Order of the Court (attached as Exhibit A).

On August 17, 2005 Plaintiff executed the General Release and Settlement Agreement.  In the General Release and Settlement Agreement, Plaintiff agreed that she "had ample opportunity to consult with her attorney(s), and has so consulted with her attorney(s), regarding the terms of this Agreement, has been advised of its meaning and consequences, has signed this Agreement of her own free will, and intends to be legally bound by all of the terms set forth in this Agreement."  See General Release and Settlement Agreement, ¶10 (attached as Exhibit B).  The General Release and Settlement Agreement outlined how the settlement proceeds would be distributed between Plaintiff and her attorney.  See Id., ¶ 1.  Plaintiff also agreed in the General Release and Settlement Agreement to "stipulate to the dismissal, with prejudice and

without attorneys' fees or costs to any party, of the claims against MEDCO in the Action and to withdraw said Action." Id., ¶ 5. After executing the General Release and Settlement Agreement, the parties timely filed the Joint Stipulation of Voluntary Dismissal with the Court on August 30, 2005. See Joint Stipulation of Voluntary Dismissal (attached as Exhibit C). Plaintiff also received and cashed the settlement checks she received in return for executing the General Release and Settlement Agreement and filing the Joint Stipulation of Voluntary Dismissal.

On October 14, 2005, Plaintiff filed the instant pro se Motion to Set Aside Voluntary Dismissal. Although the Motion is in Plaintiff's own handwriting, which makes it difficult to decipher, it appears Plaintiff seeks to have this case reopened because she is no longer happy with the fee arrangement she agreed to with her counsel. For instance, on the first page of her Motion she states: "money taken under duress." See Motion to Set Aside Voluntary Dismissal. On the next page, she states: "No Nadia Von Magenko," presumably stating her desire that Attorney Nadia von Magdenko no longer represent Plaintiff in this matter. Id. The Motion also states: "No Peggy for Judge," presumably referring to the Honorable Peggy A. Leen, the Magistrate Judge that presided over the early neutral evaluation session. Id.

The Motion to Set Aside Voluntary Dismissal also appears to insinuate that Arthur Berry, a supervisor that left Medco prior to Plaintiff's decision to retire from Medco, did not freely testify at his deposition. Id. Plaintiff further complains that her attorney never spoke with Ed Martin or John Ferguson about the case. Id. Finally, Plaintiff claims that Ed Martin, her supervisor at the time Plaintiff retired, would be lying if he claimed to be unaware that Plaintiff had been diagnosed with Parkinsons. Id. The only two individuals deposed in this action were Plaintiff and Mr. Berry. Plaintiff was present at the deposition of Mr. Berry. See

Doc. #4742202                                    4

Deposition of Arthur Berry Dated July 19, 2005 (attached as Exhibit D). Both depositions predated the early neutral evaluation session.

## ARGUMENT

Federal Rule of Civil Procedure 60 is the vehicle by which a litigant can seek relief from a final judgment. Fed. R. Civ. P. 60. As there is no claim of a clerical error associated with the Judgment, the only option left to Plaintiff is to proceed under Rule 60(b).

Under Rule 60(b), a party can obtain relief from a judgment upon motion and upon such terms as are just if the movant can show: (1) mistake, surprise or excusable neglect; (2) newly discovered evidence; (3) fraud or other misconduct; (4) a void judgment; (5) a satisfied or discharged judgment; or (6) any other reason justifying relief from the operation of the judgment. Backlund v. Barnhart, 778 F.2d 1386, 1388 (9th Cir. 1985); Fed. R. Civ. P. 60(b). The final 'catch all' provision, for "any other reason justifying relief from the operation of the judgment," is reserved for situations of "manifest injustice." Lehman v. U.S. of America, 154 F.3d 1010, 1017 (9th Cir. 1998). It is to be used "sparingly" and may only be used where the injury suffered by the movant was caused by circumstances beyond the movant's control such that the movant could not have taken any action to protect her interests prior to the judgment being entered. Id.

Rule 60(b) cannot be used to relieve a party from a free and deliberate choice, even if the choice appears in hindsight to have been the wrong decision. Ackermann v. U.S., 340 U.S. 193, 198 (1950) ("there must be an end to litigation someday, and free, calculated, deliberate choices are not to be relieved from"); In re Pacific Far East Lines, 889 F.2d 242, 250 (9th Cir. 1989) (where parties make deliberate litigation choices, Rule 60(b) will not provide a second chance); see also U.S. of America v. Roca-Suarez, 1998 U.S. App. LEXIS 15383 at *4 (9th Cir. 1998). There can be no question that Plaintiff's decision to settle with Medco, sign the General

Release and Settlement Agreement, agree to the Joint Stipulation of Voluntary Dismissal and cash the settlement checks was a free and deliberate choice. She herself, along with her counsel, participated in the early neutral evaluation session; she signed the General Release and Settlement Agreement; and, by signing the General Release and Settlement Agreement, she agreed that her decision to execute the Agreement and to dismiss her claims with prejudice was "of her own free will." See General Release and Settlement Agreement, ¶10. Moreover, Plaintiff signed the General Release and Settlement Agreement on August 17, 2005 and made no attempt to revoke this agreement prior to filing the Joint Stipulation of Voluntary Dismissal on August 30, 2005. Plaintiff made a deliberate and knowing choice to end this litigation in return for a monetary payment from Medco. This decision was not due to any mistake, inadvertence, surprise or excusable neglect. Engleson v. Burlington N. R.R. Co., 972 F.2d 1038, 1033 (9th Cir. 1992); see also Sawka v. HealthEast, Inc., 989 F.2d 138, 140 (3rd Cir. 1993); Cole Family P'ship v. Lipstein, 1997 U.S. App. LEXIS 5171 at *2 (9th Cir. 1997). Plaintiff cannot now be heard to complain of this decision just because she is having second thoughts.

Plaintiff's insinuation that Arthur Berry did not freely testify at his deposition provides no basis to reopen this action. First, Rule "60(b)(3) require[s] that fraud be proven by clear and convincing evidence, not . . . discoverable by due diligence before or during the proceedings, and be materially related to the submitted issue." Pacific & Artic R.R. and Navigation Co. v. United Trans. Union, 952 F.2d 1144, 1148 (9th Cir. 1991). Plaintiff presents no evidence that Medco fraudulently interfered with Mr. Berry's ability to testify. Plaintiff claims only that Marc Zaken, counsel for Medco, spoke with Mr. Berry. Moreover, notwithstanding Plaintiff's claim that Mr. Berry did not testify freely during his deposition, Mr. Berry did testify that Plaintiff's performance was satisfactory and that he was aware that Plaintiff was diagnosed with

Doc. #4742202                                           6

Parkinsons. See Deposition of Arthur Berry Dated July 19, 2005 at 9-12, 15-18. Second,

Plaintiff was present at the deposition of Mr. Berry and, therefore, was fully aware of the extent

of Mr. Berry's testimony at the time she agreed to settle her claims and sign the General Release

and Settlement Agreement. Likewise, Plaintiff should have been aware of the extent of

investigation her attorney conducted prior to executing the General Release and Settlement

Agreement, i.e. whether or not her attorney spoke with Ed Martin or John Ferguson. Plaintiff

certainly was capable of asking inquiring as to the status of her attorney's investigation prior to

executing the General Release and Settlement Agreement. There was also nothing preventing

Plaintiff from continuing the litigation and deposing Mr. Martin to determine whether or not he

would lie about whether he was aware that Plaintiff had Parkinsons. In short, not one of these

issues can provide a basis for relief under Rule 60(b). Plaintiff's decision to settle her claims

and cash the settlement checks was free, calculated, and deliberate.

It is also insufficient for Plaintiff to claim, as it appears she does, that, in connection

with her agreement to settle with Medco, her own attorney forced her to agree to an excessive

compensation arrangement. When the misconduct complained of does not pertain to the

adverse party, no relief can be afforded Plaintiff under Rule 60(b)(3). Fed. R. Civ. P. 60(b)(3)

("fraud (whether heretofore denominated intrinsic or extrinsic), misrepresentation, or other

misconduct of an adverse party") (emphasis added); Alexander v. Robertson, 882 F.2d 421, 424

(9th Cir. 1989). Further, before signing the General Release and Settlement Agreement,

Plaintiff was aware of the amount her attorney would be compensated because the Agreement

she signed outlined how the settlement proceeds would be distributed between Plaintiff and her

attorney. See General Release and Settlement Agreement, ¶ 1; see also Pacific & Artic R.R.

and Navigation Co. v. United Trans. Union, 952 F.2d 1144, 1148 (9th Cir. 1991) (a claim of

fraud under Rule 60(b)(3) must be "proven by clear and convincing evidence, not discoverable

by due diligence before or during the proceeding, and be materially related to the submitted issue"). Any issue Plaintiff now has with the fees charged by her counsel is an issue she should raise with her attorney. It does not provide any basis by which to reopen this litigation.

### CONCLUSION

Therefore, based on the foregoing, Defendant respectfully requests that Plaintiff's Motion to Set Aside Voluntary Dismissal be denied in its entirety.

Dated this 1st day of November, 2005.

DLA PIPER RUDNICK GRAY CARY US LLP

_Joanna S. Kishner_

Gary C. Moss, Esq.
Joanna S. Kishner, Esq.
3960 Howard Hughes Parkway
Suite 400
Las Vegas, Nevada 89109

Marc L. Zaken, Esq.
EDWARDS & ANGELL LLP
301 Tresser Blvd.
Stamford, CT 06901

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and correct copy of the foregoing

**DEFENDANT'S OPPOSITION TO PLAINTIFF'S MOTION TO SET ASIDE**

**VOLUNTARY DISMISSAL AND MEMORANDUM OF POINTS AND AUTHORITIES**

**IN SUPPORT THEREOF** was served by mail in a first class, postage-paid envelope to the

following:

        Nadia Von Magdenko, Esq.
        Barron & Pruitt, LLP
        1404 S. Jones Blvd.
        Las Vegas, Nevada 89146

        Edith Leddy
        5215 Ocala Lane
        Las Vegas, Nevada 89122

this 1st day of November, 2005.

                                    An Employee of DLA Piper Rudnick
                                    Gray Cary US LLP

10-25-05   14:38   From-DLAPRGCUSLLP                  7027371612           T-270  P 09/10  F-258

2005 AUG -3  P 4: 43

UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA                    HZ

|  |  |  |
|---|---|---|
| EDITH LEDDY, et al., | ) | |
| Plaintiffs, | ) | Case No. CV-S-04-1070-JCM (RJJ) |
| | ) | **MINUTE ORDER OF THE COURT** |
| vs. | ) | |
| MEDCO HEALTH SOLUTIONS OF | ) | DATED: August 2, 2005 |
| LAS VEGAS, INC., | ) | |
| Defendant. | ) | |

PRESENT: THE HONORABLE PEGGY A. LEEN, United States Magistrate Judge

JUDICIAL ASSISTANT: Carol A. Knight          RECORDER/TAPE # None

COUNSEL FOR PLAINTIFF: Nadia Von Magdenko

COUNSEL FOR DEFENDANT: Marc L. Zaken

PROCEEDINGS: Early Neutral Evaluation Session

An early neutral evaluation session was conducted with the undersigned Magistrate Judge commencing at 1:30 p.m. on August 2, 2005. In addition to above counsel, plaintiff Edith Leddy was present. Also present were Rich Jones, vice president and general manager of Medco; and Joe Galardi, vice president and employee relations counsel for Medco, on behalf of the defendant. The court heard presentations from counsel and from each of the parties present and thereafter met individually with counsel and each individual party. Discussions concluded at 4:30 p.m.

**A settlement was reached the terms of which are confidential.** The parties are to meet and confer to execute settlement/release documents and dismissal papers and distribute the settlement proceeds no later than 4:00 p.m., September 1, 2005.

**25**

IT IS ORDERED that a telephonic status hearing with counsel is scheduled for 4:30 p.m., September 6, 2005, in the chambers of the undersigned. If dismissal papers have been lodged with the court, the hearing will be automatically vacated. If a telephonic status hearing is required, counsel for plaintiff shall initiate the call.

PEGGY A. LEEN
UNITED STATES MAGISTRATE JUDGE

# GENERAL RELEASE AND SETTLEMENT AGREEMENT

This GENERAL RELEASE AND SETTLEMENT AGREEMENT ("Agreement") is made this 17th day of August, 2005, by and between EDITH LEDDY and MEDCO HEALTH SOLUTIONS OF LAS VEGAS, INC. and MEDCO HEALTH SOLUTIONS, INC. EDITH LEDDY is herein defined as including herself and her heirs, administrators, executors, agents, assigns, affiliates, representatives, and attorney(s) (hereinafter referred to collectively as "LEDDY"); and MEDCO HEALTH SOLUTIONS OF LAS VEGAS, INC. and MEDCO HEALTH SOLUTIONS, INC. are herein collectively defined as including itself, its insurers, attorneys, representatives, affiliates, heirs, executors, administrators, agents, assigns, successors, predecessors, corporate parents, subsidiaries, shareholders, members, and present and former officers, directors and employees (hereinafter referred to collectively as "MEDCO") (LEDDY and MEDCO are collectively referred to hereinafter as the "PARTIES");

WHEREAS, on or about August 3, 2004, LEDDY commenced a civil action against MEDCO in the United States District Court for the District of Nevada, captioned EDITH LEDDY v. MEDCO HEALTH SOLUTIONS, INC. (Case No. CV-S-04-1070-JMC-RJJ) (the "Action"), regarding her employment with MEDCO;

WHEREAS, the PARTIES, so as to avoid the additional cost and investment of time associated with protracted litigation, have agreed to resolve any and all claims that the PARTIES have, or may have, now or in the future, asserted or unasserted, against each other relating to LEDDY'S employment with MEDCO;

NOW THEREFORE, in consideration of their mutual promises herein contained and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, it is agreed as follows:

1.     As consideration for LEDDY'S agreement to be bound by the terms of this Agreement, MEDCO agrees to pay FIFTEEN THOUSAND DOLLARS ($15,000.00) to LEDDY in accordance with subparagraphs (a) and (b) below. All funds paid by MEDCO will hereinafter be referred to collectively as "Settlement Proceeds." The Settlement Proceeds will be paid as follows:

(a)     MEDCO agrees to pay SEVEN THOUSAND FIVE HUNDRED DOLLARS ($7,500) of the Settlement Proceeds to Barron & Pruitt, LLP as LEDDY's attorneys' fees within fourteen (14) days after this Agreement is executed by the PARTIES. MEDCO will in due course issue an IRS Form 1099 to Barron & Pruitt, LLP for such payment.

(b)     MEDCO agrees to pay SEVEN THOUSAND FIVE HUNDRED DOLLARS ($7,500) of the Settlement Proceeds to LEDDY within fourteen (14) days after this Agreement is executed by the PARTIES. MEDCO will in due course issue an IRS form 1099 to LEDDY for such payment.

(c)     LEDDY agrees to be fully and solely responsible for the timely and proper filing, reporting and payment with respect to any and all federal and state estimated tax payments and income tax obligations incurred by her as a result of her receipt of such Settlement Proceeds. Further, LEDDY agrees to indemnify and hold MEDCO harmless from any portion of LEDDY'S potential federal and state income tax liabilities or any potential federal and state income tax liabilities on the part of MEDCO to the Internal Revenue Service, or any other state or local taxing authority, with respect to any

- 2 -

STM_196764_1/JSTRETTON

withholding obligations on behalf of MEDCO as a result of the payment of the Settlement Proceeds.

2.   LEDDY hereby releases, discharges and holds harmless MEDCO from all causes of action, suits, debts, dues, sums of money, accounts, reckonings, bonds, bills, specialties, covenants, contracts, controversies, agreements, promises, variances, trespasses, damages, judgments, extents, executions, claims, and demands whatsoever, in law, admiralty or equity, including, but not limited to, all claims arising under

- Title VII of the Civil Rights Act of 1964;
- The Civil Rights Act of 1991;
- Sections 1981 through 1988 of Title 42 of the United States Code;
- The Employee Retirement Income Security Act of 1974;
- The Immigration Reform and Control Act;
- The Americans with Disabilities Act of 1990;
- The Age Discrimination in Employment Act of 1967;
- The Workers Adjustment and Retraining Notification Act;
- The Occupational Safety and Health Act;
- The Sarbanes-Oxley Act of 2002;
- The National Labor Relations Act;
- The Family and Medical Leave Act of 1993;
- The Fair Labor Standards Act;
- The Consolidated Omnibus Budget Reconciliation Act;
- The Labor Management Relations Act;
- Any claim for negligent and/or intentional infliction of emotional distress;
- Any other federal, state or local civil or human rights law or any other local, state or federal law, regulation or ordinance;
- Any public policy, contract, tort, or common law; or
- Any claim for costs, fees, or other expenses including attorneys' fees incurred in these matters,

which LEDDY ever had, now has, or hereafter can, shall, or may have for or by reason of any matter, cause, or thing whatsoever, from the beginning of the world to the date of this Agreement.

3.   LEDDY hereby agrees and covenants that neither she, nor any other organization or other entity on her behalf with her permission, will file, charge, claim, sue, or cause or permit

- 3 -

to be filed, charged or claimed, any civil action, suit, complaint, charge or legal proceeding (including any action for damages, injunctive, declaratory, monetary relief or other relief) against MEDCO and/or its respective subsidiaries, affiliates, parent corporations, shareholders, directors, officers, employees, agents, past and present, involving any matter occurring at any time in the past up to the date of this Agreement or involving any continuing effects of any acts or practices which may have arisen or occurred prior to the date of this Agreement. LEDDY understands that should she violate this Paragraph, she may be sued for damages for breach of contract. To the extent that the law prohibits LEDDY from waiving her right to bring and/or participate in the commencing any civil action, suit, complaint, charge or legal proceeding, LEDDY nevertheless waives her right to seek or accept any damages or relief in any such proceeding.

4.      LEDDY agrees that neither she nor her attorneys will assert a claim against MEDCO for attorneys' fees or costs and waives any rights to assert such a claim, except as stated in Paragraph 1(a) above.

5.      LEDDY agrees to stipulate to the dismissal, with prejudice and without attorneys' fees or costs to any party, of the claims against MEDCO in the Action and to withdraw said Action. LEDDY further agrees that she or her attorneys will file with the United States District Court for the District of Nevada and any other applicable body, board, commission, agency or court such withdrawals, stipulations, affidavits and other documents as may be required to withdraw, with prejudice and without attorneys' fees or costs to either party, any other action or legal proceedings, administrative or judicial, now pending concerning any claim LEDDY may have made against MEDCO.

6.      LEDDY agrees, from this date forward, to keep the terms of this Agreement confidential and, with the exception of communications with attorneys, tax advisors and her

- 4 -

spouse, not to disclose the same to any other person, corporation, or other entity, except pursuant to a court order or other valid governmental authority and only after giving MEDCO at least ten (10) days advance written notice of: (1) any proceeding at which a court order regarding the disclosure of information in this Agreement is sought; (2) any subpoena or process requiring or requesting disclosure of information in this Agreement; and (3) the date on which disclosure is proposed or ordered to be made to allow MEDCO to respond thereto and/or seek appropriate relief to maintain the confidentiality of this Settlement Agreement. This confidentiality provision applies to and expressly prohibits all communications by LEDDY to any person or entity including, without limitation, communications to any present, former or future MEDCO employee. LEDDY further agrees that she will not voluntarily disclose the allegations which formed the basis of the legal actions described in this Agreement to any person, organization or entity except in response to a state or governmental investigatory inquiry or pursuant to legal process and where compelled by subpoena. Prohibited conduct under this paragraph includes voluntarily testifying against MEDCO on any matter or voluntarily assisting any individual with a claim against MEDCO. LEDDY understands that if this Settlement Agreement were not signed, she would have the right to voluntarily assist other individuals or entities in bringing claims against MEDCO. LEDDY hereby waives that right and she will not provide any such assistance, other than assistance in an investigation or proceeding conducted by an agency of the United States government. To the extent that the law prohibits LEDDY from waiving her right to bring and/or participate in the investigation of a claim, LEDDY nevertheless waives her right to seek or accept any damages or relief in any proceeding.

7. The PARTIES agree that no part of this Agreement shall ever be used in any proceeding, nor under any circumstances be construed, as an admission of liability by MEDCO

- 5 -

and, further, that this Agreement was entered into by MEDCO so as to avoid the additional cost
and investment of time associated with continued litigation

8.      LEDDY agrees not to seek reinstatement or reemployment by MEDCO, or any of
its respective subsidiaries, affiliates or parent corporations, and waives any right to any such
position(s). LEDDY further agrees that this Settlement Agreement is good and sufficient cause
for MEDCO, or any of its respective subsidiaries, affiliates or parent corporations, to reject any
such application for reinstatement or reemployment.

9      LEDDY agrees that she will not disparage or criticize MEDCO or its management
philosophies, direction, or values in communications with third parties   MEDCO agrees that in
responses to requests for references regarding LEDDY, it will not disparage or criticize LEDDY
but will state that it is the policy of MEDCO to confirm only dates of employment and position
title in response to such requests for references regarding former employees and will therefore
provide LEDDY'S dates of employment and position title only.

10.      LEDDY represents that she has had ample opportunity to consult with her
attorney(s), and has so consulted with her attorney(s), regarding the terms of this Agreement, has
been advised of its meaning and consequences, has signed this Agreement of her own free will,
and intends to be legally bound by all of the terms set forth in this Agreement.

11.      This Agreement is binding upon and shall inure to the benefit of all PARTIES
hereto and their respective agents, employees, assigns and successors in interest.

12      No amendment or variation of the terms or provisions of this Agreement shall be
valid unless made in writing and agreed to and signed by each party hereto

13.      This Agreement may be executed in two (2) counterparts, and each shall be
deemed to be an original.

STM_196764_1/JSTRETTON

14.    This Agreement shall be governed by the laws of the State of Nevada.

15.    This Agreement sets forth the entire agreement between the PARTIES, and fully supersedes any prior agreements or understandings between the PARTIES. LEDDY acknowledges that she has not relied on any representations, promises, or agreements of any kind made to her in connection with her decision to sign this Agreement, except for those set forth in this Agreement.

16.    If any terms of this Agreement are declared invalid by any court of competent jurisdiction, the Agreement shall be deemed amended by excluding the invalid term or terms, and all remaining terms shall continue in full force and effect. LEDDY agrees to execute such amendments as may be necessary to accomplish the intent of this paragraph, which is to maintain in force all terms of this Agreement to the full extent permitted by law.

17.    <u>WAIVER OF RIGHT TO JURY TRIAL</u>. EACH PARTY TO THIS SETTLEMENT AGREEMENT HEREBY EXPRESSLY, VOLUNTARILY, KNOWINGLY AND IRREVOCABLY WAIVES ANY CONSTITUTIONAL OR OTHER RIGHT EACH MAY HAVE TO A TRIAL BY JURY IN THE EVENT OF LITIGATION CONCERNING ANY CLAIM, DEMAND, ACTION OR CAUSE OF ACTION: (1) ARISING UNDER THIS SETTLEMENT AGREEMENT OR ANY OTHER INSTRUMENT, DOCUMENT OR AGREEMENT EXECUTED OR DELIVERED IN CONNECTION THEREWITH; OR (2) IN ANY WAY CONNECTED WITH OR RELATED OR INCIDENTAL TO THE DEALINGS OF THE PARTIES HERETO OR ANY OF THEM WITH RESPECT TO ANY INSTRUMENT, DOCUMENT OR AGREEMENT RELATED IN ANY WAY WHATSOEVER TO THE SUBJECT MATTER OF THIS AGREEMENT UP TO AND INCLUDING THE DATE OF THIS

STM_196764_1/ISTRETTON

P.08

AGREEMENT.   ANY PARTY TO THIS AGREEMENT MAY FILE AN ORIGINAL

COUNTERPART OR COPY OF THIS SECTION WITH ANY COURT AS WRITTEN

EVIDENCE OF THE CONSENT OF THE PARTIES HERETO TO THE WAIVER OF

THEIR RIGHT TO TRIAL BY JURY.

The undersigned hereby accept and agree to be bound by the terms of this GENERAL

RELEASE AND SETTLEMENT AGREEMENT.

_Edith Leddy_
EDITH LEDDY

MEDCO HEALTH SOLUTIONS
OF LAS VEGAS, INC.

By: _J. Galardi_
Authorized Representative
Joseph C. Galardi

Sworn to on this 17+ day
of August, 2005

Notary Public

Sworn to on this 26 day
of August, 2005

Notary Public
JOAN C. MARRI
Notary Public of New Jersey
My Commission Expires Dec. 21, 2005

MEDCO HEALTH SOLUTIONS, INC.

By: _J. Galardi_
Authorized Representative -
Joseph C. Galardi
Sworn to on this 26 day
of August, 2005

Notary Public

NADIA von MAGDENKO
Notary Public, State of Nevada
Appointment No. 01718521
My Appt. Expires Nov 8, 2005

JOAN C. MARRI
Notary Public of New Jersey
My Commission Expires Dec. 21, 2005

STM_196764_1/JSTRETTON

10-25-05  14:39  From-DLAPRGCUSLLP          7027371612          T-270  P 06/10  F-250



**ORIGINAL**

GARY C. MOSS, ESQ.
State Bar No. 4340
IOANNA S. KISHNER, ESQ.
State Bar No. 5037
DLA PIPER RUDNICK GRAY CARY, LLP
3960 Howard Hughes Parkway
Suite 400
Las Vegas, NV 89109
(702) 737-3433

MARC L. ZAKEN, ESQ.
EDWARDS & ANGELL LLP
301 Tresser Blvd.
Stamford, CT 06901
(203) 353-6819
Attorneys for Defendants

UNITED STATES DISTRICT COURT
DISTRICT OF NEVADA

EDITH LEDDY,                       )
                                   )
            Plaintiff,             )      CV-S-04-1070-JCM-RJJ
                                   )
    v                              )
                                   )
MEDCO HEALTH SOLUTIONS OF          )
LAS VEGAS, INC.                    )
                                   )
            Defendant.             )
                                   )

JOINT STIPULATION OF VOLUNTARY DISMISSAL

Pursuant to Rule 41(a)(1) of the Federal Rules of Civil Procedure, the parties hereby

stipulate to the dismissal of this action, with prejudice, and without costs or attorneys' fees to

either party.

26

Dated this 29th day of August, 2005.

THE PLAINTIFF
EDITH LEDDY

Nadia von Magdenko
Barron & Pruitt, LLP
1404 South Jones Boulevard
Las Vegas, NV 89146

THE DEFENDANT
MEDCO HEALTH SOLUTIONS
OF LAS VEGAS, INC.

Marc L. Zaken, Esq.
EDWARDS & ANGELL LLP
301 Tresser Blvd.
Stamford, CT 06901

Gary C. Moss, Esq.
Joanna S. Kishner, Esq.
DLA PIPER RUDNICK GRAY CARY
3960 Howard Hughes Parkway
Suite 400
Las Vegas, NV 89109
Attorneys for Defendants

IT IS SO ORDERED

DATED Sept 12 2005

UNITED STATES DISTRICT JUDGE

## CERTIFICATE OF SERVICE

This is to certify that a copy of the foregoing Stipulation of Voluntary Dismissal was

mailed via first class mail, postage prepaid to counsel for the Defendant, addressed as follows:

Joanna S. Kishner
DLA PIPER RUDNICK GRAY CARY, LLP
3960 Howard Hughes Parkway
Suite 400
Las Vegas, NV 89109

Marc L. Zaken
EDWARDS & ANGELL LLP
301 Tresser Blvd.
Stamford, CT 06901
(203) 353-6819

this 30th day of August, 2005.

Nadia von Magdenko, Counselor At Law

**Volzing Sutherland LLC**

Court Reporters

DISTRICT COURT
CLARK COUNTY, NEVADA

EDITH LEDDY,                         )
                                     )
                    Plaintiff,       )
                                     )
vs.                                  )      CASE NO.
                                     )      CV-S-04-1070-JCM
MEDCO HEALTH SOLUTIONS OF            )      (RJJ)
LAS VEGAS, INC.,                     )
                                     )
                    Defendant.       )
_____)

*Volzing Sutherland LLC*
**CERTIFIED COPY**
*Court Reporters*

DEPOSITION OF ARTHUR BERRY
Taken at DLA Piper Rudnick Gray Cary US LLP
at 3960 Howard Hughes Parkway
Suite 400
Las Vegas, Nevada 89109

On Tuesday, July 19, 2005
at 2:06 p.m.

Reported by:  Jualitta Stewart, CCR No. 807, RPR

VOLZING SUTHERLAND LLC    (702) 785-0777

Main Office: 930 South Fourth Street, Suite 200, Las Vegas, NV 89101 • 3800 Howard Hughes Parkway, Suite 110, Las Vegas, NV 89109
Phone (702) 785-0777 • Fax (702) 785-0780

**Volzing Sutherland LLC**
Court Reporters

## LAWYER'S NOTES

| PAGE | LINE | |
|------|------|---|
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

*Volzing Sutherland LLC — Court Reporters — (702)785-0777 — Fax (702)785-0780*

Berry 7/19/2005

Page 2

1  APPEARANCES:

2  For the Plaintiff,   Edith Leddy:

3                       NADIA VON MAGDENKO, ESQ.
                        Barron & Pruitt, LLP
4                       1404 South Jones Boulevard
                        Las Vegas, Nevada  89146
5

6
   For the Defendant,   Medco Health Solutions of
7                        Las Vegas, INC.:

8                       MARC L. ZAKEN, ESQ.
                        Edwards & Angell, LLP
9                       301 Tresser Boulevard
                        Stamford, Connecticut  06901
10

11
   Also Present:        Edith Leddy
12

13

14

15                            --o0o--

16

17

18

19

20

21

22

23

24

25

Berry 7/19/2005

1            I N D E X

2

3 WITNESS                                    PAGE

4 ARTHUR BERRY

5   Examination by Ms. von Magdenko            5

6   Examination by Mr. Zaken                  30

7   Further Examination by Ms. von Magdenko   42

8

9                  --o0o--

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Volzing Sutherland LLC
702-785-0777

Berry 7/19/2005

Page 4

1                    E X H I B I T S

2

3   PLAINTIFF'S                                  MARKED

4   1 - 1996 Performance Appraisal                 10

5   2 - 1997 Performance Management Process        11
        Performance Appraisal Summary
6
    3 - 1998 Performance Management Process        12
7       Performance Appraisal Summary

8   4 - August 20, 1999 memo                        14

9   5 - September 24, 1999 memo                     14

10  6 - 1999 Performance Management Process         19
        Performance Appraisal Summary
11
    7 - 2000 Performance Management Process         19
12      Performance Appraisal Summary

13  8 - 2001 Performance Management Process         20
        Performance Appraisal Summary
14
    9 - 2002 Year-End Review                        21
15

16

17

18  DEFENDANT'S                                   MARKED

19    None

20

21                    --o0o--

22

23

24

25

Berry 7/19/2005

Page 5

```
 1                    LAS VEGAS, NEVADA;
 2            Tuesday, July 19, 2005; 2:06 P.M.
 3
 4                     ARTHUR BERRY,
 5   having been first duly sworn, testified as follows:
 6
 7                     EXAMINATION
 8   BY MS. VON MAGDENKO:
 9        Q.    Would you please state and spell your
10   name for the record.
11        A.    Arthur, A-r-t-h-u-r, Berry, B-e-r-r-y.
12        Q.    Mr. Berry, have you ever had your
13   deposition taken before?
14        A.    Yes.
15        Q.    How many times?
16        A.    Numerous.
17        Q.    Do you need to dispense with the
18   admonitions?
19        A.    I'm sorry?
20        Q.    Do you need me to --
21        A.    Yes.  I don't need them.
22        Q.    What is your date of birth?
23        A.    8/17/43.
24        Q.    Are you currently married?
25        A.    Yes.
```

Page 6

1    Q.    What's the highest level of education
2  you've obtained?
3    A.    At this point I guess I'm maybe ten
4  credits shy of an associates degree.
5    Q.    Is that in a certain area?
6    A.    General management.
7    Q.    Have you ever been in the military?
8    A.    Yes.
9    Q.    What branch?
10    A.    United States Air Force.
11    Q.    What year did you enter the Air force?
12    A.    1961.
13    Q.    What year did you leave the Air Force?
14    A.    1962 under honorable discharge, under
15  hardship conditions.
16    Q.    What hardship conditions?
17    A.    My father passed away leaving a family of
18  seven nearly destitute, so I got out to help them
19  out.
20    Q.    And when did you start working at Medco?
21    A.    November '92.
22    Q.    What was your position?
23    A.    Chief of security.
24    Q.    Did that position ever change while you
25  were at Medco?

Berry 7/19/2005

Page 7

1    A.   No.

2    Q.   What other employment did you have prior

3 to Medco?

4    A.   I was a police officer in Philadelphia,

5 Pennsylvania.

6         I retired in 1991 with a rank of captain.

7    Q.   Why did you move out to Las Vegas?

8    A.   It was too cold in Philly.

9    Q.   I figured.

10    A.   After chasing criminals up and down

11 alleys for 25 years, I needed a change too.

12    Q.   Did you supervise anyone as chief of

13 security?

14    A.   Yes.

15    Q.   How many people?

16    A.   Well, part of my duties as chief of

17 security at the Annie Oakley site was also facility

18 services.  By services I mean facility maintenance

19 as opposed to equipment maintenance.  So I wouldn't

20 say supervise because most of the facility

21 maintenance was done by contract workers, which is

22 supervised by their own company.  But they were

23 under my control, if you will.

24         So with that group and the security

25 officers, I would say roughly close to about 40

Berry 7/19/2005

Page 8

1   people.

2       Q.      How many people were in the maintenance

3   group?

4       A.      It varied depending what had to be done

5   in the facility.  I would say on average 15 a day.

6       Q.      And how many people were in the security

7   group on average?

8       A.      Contract maintenance was 15 a day.  And

9   then I had another clerical group that did some

10  maintenance activity, and I think we had about 8 in

11  that group.  And in the security group we had about

12  20 or 22.

13      Q.      Did you supervise Edith Leddy?

14      A.      Yes.

15      Q.      Do you know when Edith came on at Medco?

16      A.      She was hired -- actually, she came on at

17  Medco in September of 1996, but she worked with us

18  as a contract officer prior to that.  She actually

19  came proprietary officer in '96, September.

20      Q.      And was that as a security guard?

21      A.      Beg your pardon?

22      Q.      Was that as a security guard?

23      A.      Yes.

24      Q.      Did you ever perform evaluations on

25  Ms. Leddy's work performance?

Page 9

1      A.    Annually, yes.

2      Q.    Do you recall her work performance,

3  generally, offhand?

4            MR. ZAKEN:  To what point in time?

5  BY MS. VON MAGDENKO:

6      Q.    While she was at Medco.

7            MR. ZAKEN:  Objection.  Form.

8            What point in time at Medco?

9  BY MS. VON MAGDENKO:

10     Q.    You can answer the question.

11           MR. ZAKEN:  If you can.

12           THE WITNESS:  Can you repeat the question

13  for me?

14  BY MS. VON MAGDENKO:

15     Q.    As you sit here today, do you recollect

16  Ms. Leddy's performance while she was at Medco?

17           MR. ZAKEN:  Objection to form.

18  BY MS. VON MAGDENKO:

19     Q.    You can answer.

20           MR. ZAKEN:  If you can without a time

21  frame.

22  BY MS. VON MAGDENKO:

23     Q.    You can answer.

24     A.    Generally speaking, her performance was

25  satisfactory.

Page 10

1      Q.    I'm going to show you what we'll mark as

2  Plaintiff's Exhibit 1.

3      (Whereupon, Plaintiff's Exhibit No. 1 was

4          marked for identification.)

5  BY MS. VON MAGDENKO

6      Q.    Can you just look at that and tell me

7  when you're done.

8      A.    H'm h'm.

9      Q.    This document is dated January 20, 1997,

10  regarding Ms. Leddy's performance in 1996; is that

11  correct?

12      A.    Yes.

13      Q.    What was Ms. Leddy's overall performance

14  rating in 1996?  You can look at it.

15      A.    Overall performance rating on a scale of

16  one to five was a three, which is good.

17      Q.    And how is good defined?

18      A.    Satisfactory as opposed to

19  unsatisfactory.

20      Q.    What does it say on the document?

21      A.    Performance consistently meets

22  expectations and job requirements.

23      Q.    And when you say satisfactory, that's

24  what you mean?

25      A.    Yes, exactly.  Nothing less.

Berry 7/19/2005

Page 11

1      Q.      And looking at manager's comments on the

2  last page.

3      A.      H'm h'm.

4      Q.      Are these your comments?

5      A.      Yes.

6      Q.      And you state this employee is extremely

7  proficient in her duties as a security guard?

8      A.      H'm h'm.

9      Q.      Oh, just say yes or no for the record.

10     A.      Oh, I'm sorry.  Yes.

11     Q.      And in the end, you say she's a welcome

12 and valuable asset to the security team?

13     A.      Yes.

14     Q.      And do you still value your evaluation

15 performance of her?

16     A.      Absolutely, yes.

17     Q.      I'll show you Plaintiff's Exhibit 2, and

18 we'll have it marked.

19         (Whereupon, Plaintiff's Exhibit No. 2 was

20             marked for identification.)

21 BY MS. VON MAGDENKO:

22     Q.      Just take a moment to review that.

23     A.      Yes.

24     Q.      And it's dated February 23, 1998,

25 Plaintiff's Exhibit 2?

Page 12

1     A.    H'm h'm.

2     Q.    And it's regarding Ms. Leddy's

3   performance in 1997?

4     A.    Yes.

5     Q.    And did you fill out this report?

6     A.    Yes, I did.

7     Q.    And what was Ms. Leddy's overall

8   performance rating?

9     A.    At the very end, I think I closed it by

10  saying, through training, she has progressed to a

11  satisfactory level.

12    Q.    And initially you stated Evelyn has been

13  an excellent employee for 1997?

14    A.    Yes.

15    Q.    And you stand by your report?

16    A.    Yes.

17    Q.    This is Plaintiff's Exhibit 3.

18    (Whereupon, Plaintiff's Exhibit No. 3 was

19          marked for identification.)

20  BY MS. VON MAGDENKO:

21    Q.    If you could just take a moment and

22  review that, and let me know when you're done.

23    A.    Okay.

24    Q.    And it states that -- actually, this is

25  dated March 14, 1999?

Berry 7/19/2005

Page 13

1      A.    H'm h'm.

2      Q.    Is that a yes?

3      A.    Yes.

4      Q.    And it's regarding Ms. Leddy's

5  performance at Medco in 1998?

6      A.    Yes.

7      Q.    And it states under supervisor's

8  comments, in 1998, Evelyn did not meet expectations

9  that were set?

10     A.    Yes, it does state that.

11     Q.    And the supervisor's signature is

12  Edward Martin?

13     A.    H'm h'm.

14     Q.    Is that correct?

15     A.    Yes.

16     Q.    And your name is printed on here under

17  manager's approval?

18     A.    Yes.

19     Q.    Is there any reason why Mr. Martin

20  completed this form instead of you that year?

21     A.    No.  I don't know why that happened.  I

22  don't remember specifically this year, and I don't

23  know why his name is in the signature column and not

24  mine.  That is not general practice.

25     Q.    I see.  Do you recall what areas

Page 14

1 | Ms. Leddy wasn't performing well in, in 1998?

2 |     A.    I'd probably have to look at a document

3 | that I specifically signed and noted regarding her

4 | performance in '98, and I could be more clear with

5 | you.

6 |     Q.    Okay.  We'll mark this --

7 |     A.    I don't want to -- I can't particularly

8 | with seriousness comment on Lieutenant Martin's

9 | document unless I see some corroboration from my

10 | own.  I'm sure I have something written somewhere.

11 |     Q.    Okay.  This is Plaintiff's Exhibit 4 and

12 | 5.

13 |     (Whereupon, Plaintiff's Exhibit Nos. 4 and 5

14 |         were marked for identification.)

15 | BY MS. VON MAGDENKO:

16 |     Q.    Exhibit 4 is a memo dated August 20, 1999,

17 | from you to Ms. Leddy?

18 |     A.    Yes.

19 |     Q.    And Exhibit 5 is a memo from you dated

20 | September 24, 1999?

21 |     A.    Yes.  Yes, I remember these.

22 |     Q.    You drafted both these documents?

23 |     A.    Yes, I did.

24 |     Q.    And does it refresh your memory on

25 | Ms. Leddy's performance?

Page 15

1      A.     In '98?

2      Q.     Yes.

3      A.     Or '99?

4      Q.     In '98?

5      A.     Yes, it does.

6      Q.     Does it refresh your memory of

7   Ms. Leddy's performance in 1999?

8      A.     Yes.

9      Q.     And do you recall Ms. Leddy's performance

10  in 1998?

11     A.     Yes.

12     Q.     How was her performance?  Can you

13  describe it to me?

14     A.     Not as good as 1997, I can tell you that.

15  But in detail I got reports from her immediate

16  supervisor, Lieutenant Martin, that she was starting

17  to make mistakes in her computer activities where we

18  reconciled packages coming in, and that she was

19  having difficulty with the packages, medications

20  coming in.

21            And as I recall, she also had some

22  difficulty in the administrative area in the front

23  office, i.e., answering phones correctly and that

24  sort of thing.

25     Q.     Did Ms. Leddy ever advise you of a

Page 16

1  medical condition that she suffered from?

2      A.    Yes.

3      Q.    What medical condition was that?

4      A.    I think she mentioned the word

5  "Parkinson's."

6      Q.    And do you know what the symptoms of

7  Parkinson's disease are?

8      A.    I couldn't swear to it, no.  I mean, I'm

9  not -- no.

10     Q.    Do you have an understanding of what it

11 means to have Parkinson's disease?

12     A.    I have an understanding of it, yes, from

13 Mohammed Ali.  Yes, I have an understanding.

14     Q.    So you know that people shake if they

15 have Parkinson's?

16     A.    Yes.

17     Q.    Did Ms. Leddy shake?

18     A.    I saw her, yeah.  I did see her shake.

19     Q.    Was Ms. Leddy's problems with the

20 computer related to her shaking?

21     A.    Not as Lieutenant Martin demonstrated.

22 He demonstrated it as she was just putting numbers

23 in the wrong place primarily.  Putting names of

24 medications in the wrong section of the computerized

25 report and that kind of thing.

Berry 7/19/2005

Page 17

1    Q.    Did you have any firsthand knowledge,
2  though, why she had problems with the computer?
3    A.    No.   I didn't personally go back and
4  watch her.  No, I didn't.
5    Q.    Did Ms. Leddy ever tell you she had
6  problems with the computer because of her
7  Parkinson's?
8    A.    No.   She didn't identify her problems
9  directly with Parkinson's, no.
10    Q.    Did she identify any of the packages with
11  the administrative duties answering the phones with
12  Parkinson's?
13    A.    No.
14    Q.    What did she tell you when she told you
15  she had Parkinson's?
16    A.    She had told me in general conversation
17  that she was seeing a doctor, and the doctor thought
18  she may have Parkinson's, and she was being treated
19  for it.
20          I think I talked to her twice about it.
21  And then she came back -- I don't recall the
22  dates -- and said that the doctor had given her a
23  better medication, and her Parkinson's was under
24  control.  I said, Good for you.
25          But she never clearly said to me, Arthur,

Berry 7/19/2005

Page 18

1  I can't do the work back there because of my

2  Parkinson's.  Had she done that, then I would have

3  requested a doctor's note.

4      Q.    Was Ms. Leddy placed on a performance

5  improvement plan in 1998?

6      A.    Yes, h'm h'm.

7      Q.    And what was the result of that

8  performance improvement plan?

9          MR. ZAKEN:  You said 1998, did you mean

10  1999?

11          THE WITNESS:  Yes, I did.  Correct that,

12  please, 1999.

13  BY MS. VON MAGDENKO:

14      Q.    What was the result of the performance

15  improvement plan?

16      A.    The results of the performance

17  improvement plan in the end, is that what you mean,

18  in the end?

19      Q.    H'm h'm.

20      A.    Evelyn clearly demonstrated that she

21  could perform a particular function in the security

22  area, and that is to guard the security podium at

23  the front entrance.  And when she demonstrated after

24  30 days that she could clearly manage that area,

25  that's where she was finally placed on a permanent

Page 19

1  basis.

2      Q.    This will be Plaintiff's Exhibit 5.

3            MR. ZAKEN:  I think you did 5 already.

4            MS. VON MAGDENKO:  Oh, 6.  You're right.

5        (Whereupon, Plaintiff's Exhibit No. 6 was

6            marked for identification.)

7  BY MS. MAGDENKO:

8      Q.    If you could just review that.

9      A.    Yes.  I'm familiar with this.

10     Q.    And is it Ms. Leddy's performance review

11 for her performance in 1999?

12     A.    Yes, it is.

13     Q.    And is it true that you filled out this

14 report?

15     A.    H'm h'm, yes.

16     Q.    And you stated that her actions since

17 taking over the podium position are commendable?

18     A.    Yes.

19     Q.    This is Plaintiff's Exhibit 7.  If you

20 could just take a moment and review that.

21       (Whereupon, Plaintiff's Exhibit No. 7 was

22            marked for identification.)

23            MR. ZAKEN:  Do you have one for me?

24            MS. VON MAGDENKO:  Oh, it's right there.

25            MR. ZAKEN:  Thank you.

Berry 7/19/2005

Page 20

1         THE WITNESS:  I think it's another part

2    of this document.

3    BY MS. VON MAGDENKO:

4         Q.    Yes.  But this is a portion of

5    Ms. Leddy's 2000 performance review?

6         A.    A portion of it, yes.

7         Q.    And this portion has the supervisor's

8    comments?

9         A.    Yes.

10        Q.    And under supervisor comments, it states

11   in part:  "She is a true asset to the security

12   department and the company as well"?

13        A.    Yes.

14        Q.    And what was her overall performance

15   rating?

16        A.    Satisfactory, which is medium.

17   Leadership rating meets expectation as satisfactory.

18        Q.    Okay.  This is Plaintiff's Exhibit 8.

19        (Whereupon, Plaintiff's Exhibit No. 8 was

20             marked for identification.)

21          THE WITNESS:  Yes, I remember this.

22   BY MS. MAGDENKO:

23        Q.    And did you draft this document?

24        A.    Yes.

25        Q.    And it's dated January 3, 2002?

Page 21

1   A.   Yes.

2   Q.   And it's Ms. Leddy's performance

3   evaluation for 2001?

4   A.   Yes.

5   Q.   And can you read the first two sentences

6   of the supervisor's comments?

7   A.   "Officer Leddy, I can honestly say that

8   2001 was one of your best years.  Your

9   responsibilities and actions at the podium have been

10  nearly flawless."

11  Q.   I'll show you one more document, which

12  will be Plaintiff's Exhibit 9.

13  (Whereupon, Plaintiff's Exhibit No. 9 was

14        marked for identification.)

15        THE WITNESS:  Yes, I'm familiar with this

16                    one.

17  BY MS. VON MAGDENKO:

18  Q.   On the first page, it says, Manager name,

19  Arthur Berry?

20  A.   H'm h'm.

21  Q.   Is that a yes?

22  A.   Yes.

23  Q.   And on the last page, it says, Manager

24  name, Robert R. O'Connell.

25  A.   On the last page, is says --

Page 22

1    Q.    And then just for reference, we're

2  looking at Ms. Leddy's 2001 year-end review dated

3  March 26, 2003.

4    A.    Oh, yes, I see.  Apparently,

5  Robert O'Connell who was a dotted line supervisor of

6  mine signed this on 3/26/03, but I had left on 3/12.

7           So this was in the computer to be signed

8  and given over to human resources by me, but I left

9  prior to doing that, so apparently he completed the

10  signature.  But the words on page 5 of 6 are from

11  me.

12    Q.    So you completed this form?

13    A.    H!m h'm, yes.  All but the signature

14  section.

15    Q.    In section D, Summary of Employee's

16  Overall Performance, you noted:  "Evelyn, for the

17  entire year, you have performed above the

18  satisfactory level.  Your dedication to duty has not

19  gone unnoticed."

20    A.    Yes.

21    Q.    Are you aware of Ms. Leddy ever

22  sustaining a work-related injury while at Medco?

23    A.    Yes.  I remember she had fell and had

24  complained of a back injury.

25    Q.    Do you recall when she fell?

Page 23

1      A.      To be perfectly honest, not the dates.
2   No, I don't know exactly when.

3      Q.      But she complained that she hurt her
4   back?

5      A.      Yes.   She had some issues with her back.

6      Q.      Do you recall what those other issues
7   were, or did she say specifically?

8      A.      No.   What I do recall is that they didn't
9   specifically interfere with her job at the podium.
10  She was able to perform her job at the podium, and
11  so whatever the injury was, how severe it was, it
12  didn't cause me to make any changes in her position,
13  if you know what I mean.

14     Q.      Why did you leave Medco?

15     A.      As a separation agreement between me and
16  the company.

17     Q.      Retirement?

18     A.      A separation agreement between me and the
19  company.

20     Q.      What does that mean?

21     A.      It means just exactly what I said.   A
22  separation agreement between me and the company.

23     Q.      Did you leave on good terms?

24     A.      I'm always going to have good terms with
25  the company.   The company was good to me.

Berry 7/19/2005

Page 24

1    Q.   So you worked for Medco for 11 years?

2    A.   Almost.

3    Q.   Are you currently employed?

4    A.   No.

5    Q.   Have you been employed at all since

6  leaving Medco?

7    A.   No.

8    Q.   Was Ms. Leddy the only person who worked

9  solely at the podium at Medco?

10   A.   Ms. Leddy was the only person that I

11 actually signed or gave specific orders to my

12 subordinates, supervisors, to allow to work at the

13 podium permanently.

14        Now, on the other hand, the supervisor

15 had the discretion to rotate the other officers as

16 they saw fit or need.  But she was the only one that

17 I actually signed off on for that position as a

18 permanent position.

19   Q.   Did you tell Ms. Leddy it was a permanent

20 position?

21   A.   Yes.

22   Q.   Who was directly under you?

23   A.   The coordinators like Lieutenant Martin.

24 Lieutenant Martin would probably be the senior

25 coordinator, I would say.

Berry 7/19/2005

1    Q.    Was anyone equal with Lieutenant Martin?

2    A.    Not really.

3    Q.    Who was -- oh, go ahead.

4    A.    From a security guard point of view, from

5    Evelyn's point view?

6    Q.    Yes.

7    A.    No.

8    Q.    Who was below Lieutenant Martin?

9    A.    It was Cathy Sutton and Bill Scott.

10   Q.    Who was their --

11   A.    And what's her name?  I'm trying to

12   remember who I'm talking about.

13   Q.    Linda Reemer?

14   A.    Linda Reemer, yes.

15   Q.    What was their title?

16   A.    Linda Reemer was considered a lead, and

17   the other two were considered coordinators.

18   Q.    Were all security guards below them then?

19   A.    For the most part, yes.  The security

20   guards viewed them as their immediate supervisors.

21   And there was one other supervisor.  He worked

22   primarily on the dock.  I can't remember his name.

23   Q.    John Ferguson?

24   A.    No.  I can't think right now.

25   Q.    That's all right.

1          Do you have any knowledge of Ms. Leddy's

2   relationship with Lieutenant Martin?

3       A.    Knowledge in what regard?

4       Q.    How their relationship was, if they got

5   along, any conversations they had with each other.

6   Were you aware of any of that?

7       A.    I don't think Evelyn Leddy had a lot of

8   love for Lieutenant Martin, if that's what you mean.

9       Q.    Are you aware of any incidents where

10  Lieutenant Martin wouldn't allow Ms. Leddy to use

11  the restroom?

12      A.    She said to me one time that, maybe once

13  or twice even, that she had issues with Lieutenant

14  Martin not allowing her to take her breaks on time,

15  yes.  She had a problem with that.  So I had a

16  conversation with him about that.

17      Q.    And how did that conversation go?

18      A.    It went, Why don't you let Evelyn take

19  her breaks on time?  And his reply was, Well, I

20  can't always do that because I may not have anyone

21  to break her right on the minute when she starts

22  calling for her break.

23          I said, Well, let's make something clear,

24  if she has to go to an emergency, I need somebody to

25  break her even if you have to take her place to do

Berry 7/19/2005

Page 27

1   it.
2           So he understood that clearly.
3       Q.    Do you have any knowledge of Ms. Leddy's
4   relationship with Ms. Reemer?
5       A.    She had no love for Ms. Reemer either.
6   She felt that Ms. Reemer used to, quote unquote,
7   pick on her.
8       Q.    Did you think Ms. Reemer picked on
9   Ms. Leddy?
10      A.    I had a conversation with her about the
11  way she talked to Evelyn and how Evelyn may have
12  viewed her conversation to her as being harsh at
13  times.  And I had conversation with her about that,
14  and she promised to do better.  And she felt that
15  Evelyn was being a little sensitive.
16          So that's the way it was.  That's pretty
17  much what it was.
18      Q.    Who's your supervisor?
19      A.    When?
20      Q.    When you were at Medco.
21      A.    It varied.  Generally, it was the vice
22  president, general manager.
23      Q.    Did you ever tell anyone about Ms. Leddy's
24  Parkinson's?
25      A.    Yes.  I think I mentioned that to human

Berry 7/19/2005

Page 28

1   resources, Peter Michaelson.

2       Q.   What did you tell him, specifically?

3       A.   I don't recall exactly, but I think I

4   mentioned in conversation that Evelyn said she had

5   Parkinson's.  I think he asked me, did it have to do

6   anything with her job performance?  I think it was

7   during the time we were doing the performance

8   improvement plan.

9            I said, no, I don't get the impression it

10  has anything to do with it.  She didn't say that it

11  did.  So it just has to do with her performance as

12  opposed to her medical condition.

13           And he said, Okay.  Well, let's put

14  her on performance improvement plan and have

15  Lieutenant Martin supervise it more closely and see

16  how she does.

17      Q.   But you weren't supervising Ms. Leddy at

18  the time directly to see whether or not her

19  abilities to use the phone or type on the computer

20  was related to her Parkinson's or something else?

21      A.   No.  Because she had never brought

22  Parkinson's up as an issue, as an excuse.  She never

23  used it as an excuse.  So it didn't become an issue.

24  The performance was an issue.

25      Q.   But you testified earlier that you

Page 29

1  actually didn't see Ms. Leddy perform while she was

2  at the computer?

3      A.    And nor did I get any information from

4  Lieutenant Martin that her medical condition could

5  be the cause of her inefficiencies.

6      Q.    When Ms. Leddy worked at Medco, did she

7  ever lie?  Did you ever catch her lying?

8      A.    Evelyn wouldn't lie to me, no.  I don't

9  think she would lie to me.  I don't think she ever

10 has.

11     Q.    Do you consider her a truthful person?

12     A.    Very truthful person.

13         MS. VON MAGDENKO:  I just want to take a

14 quick break, unless you have some questions right

15 now.

16         MR. ZAKEN:  When you're done I'll have

17 questions.

18         (A short recess was taken.)

19 BY MS. VON MAGDENKO:

20     Q.    I just have one follow-up.

21         You left in March of 2003?

22     A.    Yes.

23     Q.    Were you around when Ms. Leddy was told

24 that she had to start rotating away from the podium?

25     A.    No, I wasn't.

Berry 7/19/2005

Page 30

```
 1        Q.    So the whole time you were there after
 2   she was put on the podium, that was a permanent
 3   position for her?
 4        A.    Yes.
 5              MS. VON MAGDENKO:  That's all the
 6   questions I have.  Thank you.
 7
 8                       EXAMINATION
 9   BY MR. ZAKEN:
10        Q.    Mr. Berry, you know who I am, I'm
11   Mark Zaken, and I represent Medco.  I have a few
12   questions related to the questions that have been
13   asked of you.  Let me just start with the last thing
14   that you were asked about.
15              Did Evelyn Leddy ever approach you at any
16   time in the 2003 time frame to discuss with you that
17   she had been asked to rotate among other
18   departments?
19        A.    You mean up until the time I left?
20        Q.    Yes.
21        A.    No, she didn't.
22        Q.    She never brought that to your attention?
23        A.    No.
24        Q.    And no one at Medco ever brought it to
25   your attention?
```

Berry 7/19/2005

Page 31

1      A.     No.

2      Q.     And you weren't consulted on that

3   decision?

4      A.     No, I wasn't.

5      Q.     Let me go back to the time frame prior to

6   the time that Ms. Leddy was put on the podium.

7             During that time period, did you notice

8   or observe her being limited in any way by her

9   Parkinson's?

10     A.     I'm sorry, from what time period?

11     Q.     The time period up until -- from the time

12  in '96 when she first started working for Medco.

13     A.     H'm h'm.

14     Q.     To the time when you placed her on the

15  podium as a full-time position sometime in September

16  of 1999, did you notice or observe her Parkinson's

17  limiting her in any way?

18     A.     Let me think about that a moment.

19            No, I'd say no.  No.  No.

20     Q.     Now, after that, she was on the podium,

21  you placed her on the podium in September of 1999?

22     A.     Yes.

23     Q.     Was she placed on the podium because of

24  performance reasons?

25     A.     Because she, for some reason, didn't seem

Page 32

1   to be able to accomplish the other security activity

2   that she had prior to that.  She just seemed not be

3   able to accomplish those functions.

4       Q.    This was a performance-based decision?

5       A.    Exactly.

6       Q.    She didn't come forward and request to be

7   placed on the podium?

8       A.    No.

9       Q.    Whose idea was that?

10      A.    Peter and I talked about that together.

11      Q.    All right.

12      A.    And that was human resources.

13      Q.    Did you make that decision because you

14  felt the podium was a job she could perform?

15      A.    Well, I made that decision because I felt

16  that, as I mentioned in my report to her, that I

17  would give her another 30-day extension at the

18  podium to see if she could perform that particular

19  function.  And that was pretty much the last

20  function I had available for her.

21      Q.    All right.  Now, by the way, is it a

22  typical procedure at Medco before terminating an

23  employee to give them a performance review

24  indicating problems?

25      A.    I think that what would have happened

Page 33

1  generally is it depends on the manager of that

2  department. And the manager of the department in

3  conjunction with human resources usually makes that

4  decision.

5      Q.   Okay. And in this case, she was placed

6  on a performance improvement plan?

7      A.   Yes.

8      Q.   Is that a typical personnel procedure at

9  Medco prior to terminating a employee?

10          MS. VON MAGDENKO: Objection. Asked and

11  answered.

12  BY MR. ZAKEN:

13      Q.   You can answer.

14      A.   Yes. I would say yes.

15      Q.   And she was given 60 days on that

16  performance improvement plan?

17      A.   I think it was a total of 90 because I

18  think I extended it after she got on the podium. So

19  it was originally 60. And I'm not sure if it was 30

20  and 30 or 60 and 30.

21          MS. VON MAGDENKO: It was a 120. It was

22  60, 30, 30.

23          MR. ZAKEN: Why don't you take a look at

24  the document.

25          THE WITNESS: Okay. Yes. Counsel's

Page 34

1  right.  It's 60, 30, and 30.
2  BY MR. ZAKEN:
3      Q.    Okay.  So what was the first 60?
4      A.    The first 60 was -- did you say what was
5  it or when was it?
6      Q.    What was it and when was it?
7      A.    The first 30, and I will just read this
8  to you.
9      Q.    The first 60.
10     A.    The first 60.  "In April of 1999 due to
11 your unsatisfactory performance in critical areas of
12 security, i.e., technical/functional knowledge of
13 site-related security, decision making/problem
14 solving, organizational awareness, and following
15 SOPs, you were placed on a 60-day performance
16 improvement plan."
17     Q.    And you're reading from what document?
18     A.    Document dated August 20, 1999,
19 Exhibit No. 4.
20     Q.    All right.  So that was the first
21 60 days?
22     A.    H'm h'm.
23     Q.    And then there was another 30 days?
24     A.    Yes.
25     Q.    And when was that?

Page 35

1    A.    "At that time I asked Lieutenant Edward

2   Martin, senior coordinator security supervisor, to

3   monitor and report on your progress.   Lieutenant

4   Martin took this a step further and offered you his

5   personal guidance and attention in hopes that you

6   would successfully meet the expectations of this

7   60-day improvement plan.

8         "Unfortunately, you did not meet

9   expectations, but you did show potential in some

10  areas.  You also demonstrated a willingness to keep

11  trying.  As a result, I authorized the extension of

12  your performance plan for another 30 days."

13    Q.    Okay.  So that was the 30-days extension?

14    A.    Yes.

15    Q.    And, again, you're reading from

16  Plaintiff's Exhibit No. 4?

17    A.    Yes.

18    Q.    Then finally she was given the last 30

19  days to perform on the podium?

20    A.    Correct.

21    Q.    So she was essentially put on a

22  performance improvement plan for a hundred and

23  twenty days?

24    A.    Yes.

25    Q.    That's four months?

Page 36

1    A.    Yes.

2    Q.    And after that four months, she wasn't

3  fired, she was removed from the performance

4  improvement plan and allowed to keep her job?

5    A.    That's correct.

6    Q.    So you didn't just fire her when she

7  wasn't working out in the back dock and in the

8  office?

9    A.    No, we didn't.

10    Q.    And was that your understanding of Medco

11  policy?

12    A.    It was my understanding of the Medco

13  policy that it was at the discretion of the manager

14  and in conjunction with human resources to determine

15  how long they stayed on the performance improvement

16  plan, whether or not they should be fired.  And it

17  wasn't the practice of the company, as I knew it, to

18  just fire people if you can find some area for them

19  to work successful in.

20    Q.    All right.  Now, you said thereafter, she

21  worked on the podium until you left?

22    A.    Yes.

23    Q.    And at some point in time, you became

24  aware of her having some type of accident at work?

25    A.    At some point, yes, I do remember

Page 37

1   something like that.

2       Q.   And what did you hear?

3       A.   I heard that she had fell by a water

4   machine or something, and she reported it to the

5   safety manager.

6       Q.   Who was that?

7       A.   Bill Schwager (Phonetic).

8            I honestly don't recall it hindering, in

9   any way, her performance at the podium or causing me

10  to take any decisive action as a result of it.

11      Q.   Did she miss any work?

12      A.   I don't think that she did.  As I

13  remember, I don't think that she did.  I don't

14  remember her being out or me having to replace her

15  because of that.

16      Q.   You don't remember?

17      A.   No.

18      Q.   And after she fell in the cafeteria, did

19  you have occasion to observe her at work?

20      A.   Oh, yes, I'm sure I did.  I'm sure I did.

21      Q.   In between the time that she fell and the

22  time that you left, did you observe her being

23  hampered or limited, in any way, as a result of this

24  fall?

25      A.   I don't remember that I do.  I don't

Page 38

1  remember that she was hampered in any way.  I don't

2  remember that she had any particular problem doing

3  her job at the podium, no.

4        Q.    How about just --

5        A.    Physically.

6        Q.    Yes.  Just walking around the facility

7  and daily activities around the facility, did you

8  notice anything different about her during that time

9  up until the time you left the company?

10       A.    No, I can't.

11       Q.    Just one second.  Let me ask you another

12  question about this review Lieutenant Martin signed

13  off on in 1998, I believe it was.  It's Exhibit 3.

14       A.    Okay.

15       Q.    You remember you saw that it was signed

16  by Lieutenant Martin and not by you?

17       A.    H'm h'm.

18       Q.    Yes?

19       A.    Yes.

20       Q.    And you said that it wasn't the general

21  practice?

22       A.    That's not the general practice.

23       Q.    What was the general practice?

24       A.    The general practice was that I signed

25  off on all these.

Page 39

1    Q.    But you don't have a recollection as to
2  why he signed this one and not you?
3    A.    No, I really do not.  We must have talked
4  about it.  I mean, this thing wouldn't have went
5  through without us at least talking about.  But this
6  is baffling me why he signed this and not me.
7    Q.    Did you agree with it?
8    A.    I don't know if I agree it with it or
9  not.  Apparently, I did because I followed up with
10 the other report in 1999.
11   Q.    So she was placed on a performance
12 improvement plan?
13   A.    Yes.
14   Q.    And you agree with that?
15   A.    Yes, absolutely.
16   Q.    So did you agree with Mr. Martin's
17 assessment that she was not meeting expectations?
18   A.    Yes.
19   Q.    Let me ask you about this word that is
20 phrased that you used as Ms. Leddy being assigned to
21 the podium permanently.  You used the word
22 "permanently."
23   A.    Yes.
24   Q.    What do you mean by that?
25   A.    It means that that would be the only

Page 40

1  function she would perform in that facility other

2  than an emergency.

3      Q.    That didn't mean -- withdrawn.

4            Does that mean that -- withdrawn.

5            Could you have removed her from the

6  podium to put her on another assignment if you felt

7  that that was warranted?

8      A.    Oh, absolutely.  By permanent I meant it

9  wasn't -- permanent is pretty much by my discretion.

10  And I could have changed or would have changed her

11  if I saw that she was willing to and was able to

12  perform another security function.

13      Q.    And by the same token, could another

14  supervisor who replaced you change that assignment?

15      A.    If the supervisor so desired, after I

16  left, they could do whatever they wanted, sure.  I

17  mean -- sure they could, yes.

18      Q.    Let me talk to you about this

19  relationship that Ms. Leddy had with Linda Reemer.

20  Do you have any understanding as to why Ms. Leddy

21  didn't have any love for Ms. Reemer?

22      A.    As I recall, apparently, when Evelyn was

23  first hired, she went over to our other site, and

24  she worked over there just guarding the place.

25      Q.    Is that the Arville site?

Page 41

1    A.    Yes.  5373 Arville Street.

2          And she was alone there guarding the site

3  because we were in the process of transitioning.

4  The site was closing, and we wanted someone in the

5  office there to sort of watch the place to make sure

6  nobody interfered with any of the equipment we had

7  left there.

8          So that was part of Evelyn's job at times

9  and part of Linda Reemer's job at times.  And I

10  think sometimes they crossed shifts.

11          And I don't remember exactly what

12  happened.  I don't remember exactly what happened,

13  but something happened.  And Linda, according to

14  Evelyn, just blamed it on Evelyn.  And Evelyn to

15  umbrage to that.  So from then on, they didn't have

16  a very good relationship.

17    Q.    And could you give me a time frame on

18  when that happened?

19    A.    It was shortly after Evelyn was hired on

20  permanently, so probably in 1996, late 1996.

21    Q.    And that was a grudge that just

22  apparently continued thereafter?

23    A.    It just continued thereafter no matter

24  how many times I talked to Linda about it.  It just

25  didn't seem to get any better.

Berry 7/19/2005

Page 42

1    Q.    And then let me just ask you one other

2  point.  You mentioned that Ms. Leddy told you that

3  she thought she might have Parkinson's.  And then in

4  a subsequent conversation with her, she said she was

5  being treated with medication, and she was doing

6  well; is that right?

7    A.    She used the word "better."

8    Q.    Better.  Now, do you recall specifically

9  telling Peter Michaelson that Evelyn Leddy had

10 Parkinson's?

11   A.    I recall mentioning it to him during a

12 conversation of her performance.

13   Q.    Do you know what exactly he said?

14   A.    No.  I don't recall exactly the exact

15 words.  I do remember him asking me, Is that

16 affecting her performance?  And I said, No.  It

17 doesn't affect her performance, but if she tells me

18 that it does, then I'll ask her for a doctor's note,

19 and we'll go from there.

20           MR. ZAKEN:  Thank you.  I don't have

21 anything else.

22

23           FURTHER EXAMINATION

24 BY MS. VON MAGDENKO:

25   Q.    You testified earlier when asked by

Page 43

1  counsel, Did Evelyn ever bring up that she was asked

2  to rotate in 2003?  And you said no.

3          If you were working at Medco, whose

4  decision would it be to rotate Ms. Leddy?  Would it

5  have been yours?

6      A.    If I was working there?

7      Q.    Yes.

8      A.    Yes.

9      Q.    So no one else could have asked her to

10  rotate while you were working there without you

11  knowing about it?

12      A.    Oh, no, absolutely not.  That's not how

13  things were done.

14      Q.    Did Ed Martin like Ms. Leddy?

15          MR. ZAKEN:  Objection.  Form.

16          Go ahead.

17  BY MS. VON MAGDENKO:

18      Q.    You can answer.

19      A.    I particularly asked him that question.

20  And he said to me, Arthur, I don't dislike Evelyn.

21  I have no problem disliking or liking Evelyn.  I

22  just want to make sure she does the job the right

23  way.  I don't have any reason to dislike her.

24          And I asked him that simply because

25  Evelyn told me that she didn't think that he did.

Page 44

1  And I went back and told Evelyn exactly what he

2  said.

3      Q.    If Ms. Leddy had advised you that she

4  couldn't do another job aside from the podium

5  because of her Parkinson's and because of her fall,

6  would you have tried to remove her from the podium?

7              MR. ZAKEN:  Objection.  Form.  It's a

8  hypothetical question.

9              Are you're asking him whether that ever

10 happened, or what would happen if that happened?

11 BY MS. VON MAGDENKO:

12     Q.    It's a hypothetical.  Do you understand

13 the question?

14     A.    Hypothetical, yes.

15     Q.    Okay.  Hypothetically.

16     A.    Can you repeat it again, please?

17     Q.    You testified earlier that you could have

18 changed Ms. Leddy's position from the podium?

19     A.    Yes.

20     Q.    What if Ms. Leddy said to you, I can't

21 change from the podium because I hurt myself from

22 the fall.  Would you have taken that into

23 consideration?

24             MR. ZAKEN:  Object to the form.

25             THE WITNESS:  Do you want me to answer

1  that?

2  BY MS. VON MAGDENKO:

3      Q.    Yes.

4      A.    Oh, yes, I would.

5      Q.    And is it possible that the manager that

6  replaced you didn't take that into consideration?

7              MR. ZAKEN:  Object to form.

8              THE WITNESS:  I don't know if I could

9  answer that because I wasn't there.

10  BY MS. VON MAGDENKO:

11      Q.    Right.  But you testified earlier that a

12  manager could do what a manager wants to do.

13      A.    As far as I'm concerned.

14      Q.    But while you were there?

15      A.    I can only comment on what would happen

16  when I was there.  I can't tell you what -- I can't

17  run that company.  I can't tell that company how to

18  run itself.  I can't tell it how to dictate to its

19  employees.  I'm not there.  I can't govern what

20  happens there.

21      Q.    But you testified earlier that a manager

22  in each department had discretion about what to do

23  with its employees.

24      A.    Yes, they do.

25      Q.    So assuming that practice continued when

Berry 7/19/2005

Page 46

1  you left --

2       A.     Right.

3       Q.     -- if the person who replaced you decided

4  to move Ms. Leddy from the podium, they could do

5  that?

6       A.     Yes.

7       Q.     I just want some clarification on a

8  question.

9            Former counsel asked you if you noticed

10  anything different from Ms. Leddy after she fell not

11  related to her duties at the podium, and you said

12  No, I can't.

13            Did you mean I can't recall, or what did

14  you mean by that?

15       A.     Yes.  That pretty much meant I can't

16  recall.  I don't specifically remember Evelyn being

17  impeded, in any way, as a result of that fall.

18            I don't remember that being -- Evelyn

19  talked to me a lot, and she would have brought that

20  to my attention.  And I don't recall her doing that.

21       Q.     But could she have and you just not

22  remember?

23       A.     Yes, she could have and I don't.  Yes.

24            MS. VON MAGDENKO:  Okay.  I have no

25  further questions.

Berry 7/19/2005

Page 47

1          MR. ZAKEN:  I don't have anything.

2          MS. VON MAGDENKO:  Thank you for your

3     time.

4          (Thereupon, the taking of the deposition

5               concluded at 3:05 p.m.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 48

1   CERTIFICATE OF DEPONENT

2

3   PAGE          LINE      CHANGE          REASON

4

5

6

7

8

9

10

11

12

13                          * * * * *

14              DECLARATION OF DEPONENT

15          I, ARTHUR BERRY, deponent herein, do

16   hereby certify and declare under penalty of perjury
     the within and foregoing transcription to be my

17   deposition in said action; that I have read,
     corrected, and do hereby affix my signature to said

18   deposition.

19

20

21                          ARTHUR BERRY

22          Subscribed and sworn to before me this
            day of              , 2005.

23

24

25                      NOTARY PUBLIC

Berry 7/19/2005

Page 49

REPORTER'S DECLARATION

STATE OF NEVADA          )
                         ) ss
COUNTY OF CLARK          )

I, Jualitta Stewart, a duly commissioned Notary Public, Clark County, State of Nevada, do hereby certify:

That I reported the taking of the deposition of the witness, ARTHUR BERRY, commencing on Tuesday, July 19, 2005, at the hour of 2:06 p.m.

That prior to being examined, the witness was by me duly sworn to testify to the truth, the whole truth, and nothing but the truth.

That I thereafter transcribed my said shorthand notes into typewriting and that the typewritten transcript of said deposition is a complete, true, and accurate transcription of said shorthand notes taken down at said time.

I further certify that I am not a relative or employee of an attorney or counsel of any of the parties, nor a relative or employee of any attorney or counsel involved in said action, nor a person financially interested in the action.

IN WITNESS WHEREOF, I have hereunto set

Berry 7/19/2005

Page 50

1  my hand and affixed my official seal in my office in

2  the County of Clark, State of Nevada, this 21st day

3  of July, 2005.

4

5  JUALITTA STEWART, RPR, CCR No. 807

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25